# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-348V

JANICE SIRL,

                        Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                        Respondent.

Special Master Horner

Filed: September 16, 2025

*Emily Beth Ashe, Anapol Weiss, Philadelphia, PA,* for Petitioner.

*Mary Eileen Holmes, U.S. Department of Justice, Washington, DC,* for Respondent.

### SUPERSEDING FINDINGS OF FACT AND CONCLUSIONS OF LAW PARTIALLY DISMISSING CLAIMS[1]

On January 8, 2021, Janice Sirl filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that following her receipt of an influenza ("flu") vaccine on September 13, 2018, she suffered a shoulder injury related to vaccine administration ("SIRVA") and/or transverse myelitis. Petition (ECF No. 1) at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

On August 7, 2025, the Chief Special Master issued Findings of Fact and Conclusions of Law dismissing both petitioner's Table SIRVA claim and her separate

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

transverse myelitis claim.  ECF No. 49.  He transferred the case out of the SPU and to the undersigned to address any possible remaining cause-in-fact claim for any other type of neurologic injury due to vaccination.  *Id.* at 2, 20.  However, petitioner moved for reconsideration of the dismissal of her transverse myelitis claim (ECF No. 52), and I granted her motion.  ECF No. 54.  Accordingly, the Chief Special Master's Findings of Fact and Conclusions of Law were withdrawn, and these superseding Findings of Fact and Conclusions of Law are issued in their place.

Sections II-III of this document represent a verbatim reissuance of the corresponding sections of the Chief Special Master's prior Findings of Fact and Conclusions of Law.  (Petitioner did not seek reconsideration of the dismissal of her Table SIRVA claim.)  As the currently assigned special master, I adopt this analysis and these conclusions as my own, though they were originally authored by the Chief Special Master. Thus, for the reasons discussed below, and based on a full review of the evidence, Petitioner is not entitled to compensation for a SIRVA Vaccine Injury Table ("Table") claim, and that claim is dismissed. However, for the reasons discussed in the order granting petitioner's motion for reconsideration, petitioner's transverse myelitis claim is not dismissed at this juncture.  Accordingly, the superseding Findings of Fact and Conclusion of Law do not include section IV of the Chief Special Masters prior analysis, which had dismissed petitioner's transverse myelitis claim.

## I.    Relevant Procedural History

On May 26, 2022, the case was assigned to the SPU. ECF No. 24. On December 16, 2022, Respondent filed a status report noting certain outstanding medical records. ECF No. 31. Petitioner subsequently filed more medical records. Respondent represented thereafter that he intended to defend this case and filed a Rule 4(c) Report on July 20, 2023. ECF No. 39 (Rule 4(c) Report).

In the Rule 4(c) Report, Respondent opposed the Table SIRVA claim on multiple grounds. *See id.* at 6-7. First, Respondent argued that Petitioner had not established that her shoulder pain began within 48 hours of vaccination because she waited nearly five months to seek treatment. *Id.* Second, Respondent challenged the first SIRVA Qualifications and Aids to Interpretation ("QAI") element, because Petitioner had a history of left shoulder pain and had a pre-existing diagnosis that would explain her symptoms. *Id.* at 7. Third, regarding the fourth QAI, Respondent noted that Petitioner's treaters attributed her left shoulder pain to various other medical conditions. Respondent also opposed the causation-in-fact claim for transverse myelitis because "the record fails to establish a more likely than not causal connection between [P]etitioner's September 13, 2018 flu vaccine and the onset of her alleged injuries." *Id.* at 8.

On October 3, 2023, the Chief Special Master ordered the parties to brief the Table issues. EFC No. 40. Petitioner thereafter filed two affidavits, plus a brief setting forth her position, on November 17, 2023. ECF No. 42 (Pet'r Br.). On December 22, 2023, Respondent filed his brief. ECF No. 43 (Resp't Br.). Petitioner filed another affidavit and her reply brief on January 5, 2024. ECF No. 45 (Pet'r Reply Br.). The matter is ripe for adjudication.

## II.    Relevant Evidence

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments.

### A.    Petitioner's Pre-Vaccination Medical Conditions and Worker's Compensation Claim

Petitioner was 51 years old at the time of vaccination and employed as an Emergency Department nurse. Ex. 2 at 2-3; Ex. 32 at 1. Petitioner's medical history is significant for acute intermittent porphyria ("AIP").[3] Ex. 8 at 1. This condition is caused by a "known genetic mutation" in Petitioner's family. *Id.*; Ex. 26 at 8. In her affidavits, Petitioner has insisted that her AIP has always been asymptomatic. Ex. 13 at 1; Ex. 32 at 2.

On April 9, 2014, Petitioner experienced a physical assault at work. Ex. 30 at 351-353, 391. Petitioner stated that she was in her office collecting her belongings after being laid off, when her manager approached and blocked the doorway. *Id.* at 353. A confrontation occurred in which the manager grabbed Petitioner by the neck with her right hand and choked her.[4] *Id.*

---

[3] Acute intermittent porphyria is "an autosomal dominant hepatic porphyria caused by mutation in the *HMBS* gene (locus: 11q23.3), which encodes hydroxymethylbilane synthase; it is manifested by recurrent attacks of abdominal pain, gastrointestinal dysfunction, and neurologic disturbances and by excessive amounts of δ-aminolevulinic acid and porphobilinogen in the urine." *Acute intermittent porphyria*, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=99479 (last visited July 30, 2025).

[4] Petitioner filed a police report on April 9, 2014, although the reporting form contained a notation that "[i]t should be understood that no investigation will normally follow, but the information in this report will be on file for whatever purpose it may fulfill." Ex. 30 at 312. In the police report, Petitioner explained that she had her office door closed and her manager had repeatedly knocked on it. *Id.* Petitioner opened the door but then went to close the door again and put her hand on her manager's arm "to move her since she was in the way of the door." *Id.* at 312-313. Petitioner wrote that her manager immediately grabbed her neck "with force" and that this "aggressive grab at [her] neck left injury marks." *Id.* at 313. *Id.* Petitioner's manager also filled out a police report. *Id.* at 311.

On April 14, 2014, Petitioner went to her primary care physician ("PCP"), Dr. Matthew Frantz, complaining of "some tenderness in the neck" after this incident. *Id.* at 212. Dr. Frantz diagnosed Petitioner with a contusion. *Id.* at 213. Petitioner also went to physical therapy ("PT") from May to July 2014. *Id.* at 131. On July 22, 2014, Petitioner filed a workers' compensation claim. *Id.* at 391.

On July 25, 2014, Petitioner was seen by Dr. Sandra Hearn, a physical medicine and rehabilitation ("PMR") physician. *Id.* at 153. Notably, Petitioner reported pain in her "left cervical paraspinals" that "radiate[d] circumferentially around neck and down to the elbow (posterior upper arm), and mostly the shoulder." *Id.* Petitioner also reported feeling weaker in her left arm. *Id.* Dr. Hearn diagnosed Petitioner with left cervical strain and "mild myelopathic signs ([right upper extremity] brisk reflexes) without symptoms." *Id.* at 155. Dr. Hearn administered trigger point injections and ordered an x-ray. *Id.* at 155-156. The x-ray found "no acute fracture" but there were degenerative changes "with disk space narrowing at C5-C6 where there are small marginal osteophytes" and "slight retrolisthesis of C5 with respect to C6 which does not change significantly on flexion or extension." *Id.* at 159.

Petitioner returned to Dr. Hearn on September 4, 2014. *Id.* at 130. At this appointment, Petitioner reported a constant 5/10 neck pain with "intermittent radiation down the left arm to the level of the elbow." *Id.* Petitioner also reported flare ups of her neck pain two to three times per week at the level of her jaw. *Id.* Dr. Hearn ordered an MRI. *Id.* at 170.

On September 18, 2014, Dr. Hearn wrote a narrative for Petitioner's workers' compensation claim. *Id.* at 126. This narrative repeated that Petitioner had "significant left-sided neck pain" that radiated to the level of the elbow. *Id.* Dr. Hearn listed the following diagnoses as caused by Petitioner's work-related injury: "left cervical strain, cervical ligamentous injury, likely resulting in C5/C6 retrolisthesis, traumatic cervical myelopathy, appears to be improving, left cervical radiculopathy, likely C5." *Id.*

Petitioner had another appointment with Dr. Hearn on October 10, 2014. Petitioner continued to complain of constant neck pain that "sometimes radiates down arm." *Id.* at 171. At a further follow-up with Dr. Hearn on December 12, 2014, Petitioner reported that her neck pain was now 3/10 and no longer radiated down her arm. *Id.* 199. However, on March 13, 2015, Petitioner reported to Dr. Hearn that her left neck pain did again radiate down her arm when it was severe. *Id.* at 205.

As part of her worker's compensation claim, and at the request of the Bureau of Workers' Compensation, Petitioner underwent a permanent partial disability examination

with Dr. Robert Kleinman on February 17, 2015. *Id.* at 260. Dr. Kleinman produced an independent medical evaluation. During this examination, Petitioner complained of a limited range of motion, "radiation of pain to the left shoulder and left arm stopping at the elbow, radiation of pain up to the base of the skull and left side of the face." *Id.* at 261. Dr. Kleinman did not find Petitioner have any disability impairment. *Id.* Petitioner obtained her own permanent partial disability examination on April 2, 2015, in which she reported difficulty lifting, reaching overhead, driving, and sleeping. *Id.* at 65.

On May 6, 2015, Petitioner underwent another independent medical evaluation at the request of her former employer's counsel with Dr. Dean Erickson. *Id.* at 48. During this evaluation, Petitioner recounted that she had "increasing pain in her left upper extremity" in the days immediately following the assault. *Id.* at 49. Petitioner stated to Dr. Erickson that she had "constant left posterior neck pain extending into the trapezius, left upper parascapular region, and in the anterior left upper extremity to the elbow more or less in a C6 distribution." *Id.* at 50. Petitioner reported that she could not lie on her left side and had increased arm pain when driving with her arm extended. *Id.* Dr. Erickson found it medically probable that she did sustain a cervical strain as a result of the workplace assault, but denied causation for a cervical ligamentous injury with C5-C6 retrolisthesis as "obviously pre-existing."[5] *Id.*

On May 21, 2015, Petitioner had an initial evaluation with Dr. Todd Hochman at an occupational medicine and therapy clinic. *Id.* at 45. Petitioner again complained of neck pain that "radiates into the shoulder and down into the triceps and biceps region, worse over the triceps region, nothing past the elbow." *Id.* at 45-46. At a follow-up appointment on August 20, 2015, Petitioner repeated that her neck pain radiated into her biceps and triceps and that it "sometimes feels like electrical sensation." *Id.* at 28. Although Dr. Hochman suggested pursuing additional evaluations, such as an electromyogram ("EMG") and a second opinion orthopedic consultation "for diagnostic purposes," *see id.*, it does not appear that Petitioner pursued any further medical treatment.

Petitioner ultimately entered into a settlement and release agreement in January 2016 with her former employer for this workers' compensation claim. *Id.* at 5-11.

## B.    Petitioner's Vaccination and Subsequent Treatment

---

[5] Petitioner had another independent medical evaluation with Dr. Erikson regarding her attempt to obtain coverage for the diagnoses of traumatic cervical myelopathy and left cervical radiculopathy. *Id.* at 35-36. Dr. Erickson concluded that because there was "so little evidence of an ongoing condition consistent with traumatic cervical myelopathy" and because Petitioner had not received any neurodiagnostic testing, neither condition should be allowed. *Id.* at 36-37.

On May 2, 2018, Petitioner had routine physical examination. Ex. 26 at 8. Other than referencing her past AIP diagnosis, Petitioner expressed no other concerns. *Id.* Petitioner was told to continue with a healthy lifestyle and return in one year. *Id.* at 10. Several months later (on September 13, 2018), Petitioner received a flu vaccine at the medical facility where she worked. Ex. 1 at 1; Ex. 32 at 1.

There is a subsequent five-month treatment gap. On February 2, 2019, Petitioner had an appointment with Dr. Travis Cleland, a PMR physician. Ex. 2 at 1. Dr. Cleland wrote,

> The patient is a 51 year old year old [sic] female with no significant past medical who reports a 3 year history of neck pain. She reports in October[6] she had a flu shot, which started some left arm pain. She also reports right elbow pain and her thighs go numb when she tilts her head forward. She states this is likely all related to her neck.
>
> Currently, the pain is localized to neck. The pain can radiate or refer into her left shoulder[,] right elbow and bilateral thighs. The pain is described as intermittent and achy. The pain ranges from 0-5/10. The pain is worse with most activity. The pain is better with rest. Intermittent numbness to the right thigh. Denies weakness, recent falls, bowel or bladder incontinence.

*Id.* Dr. Cleland found that Petitioner had painful range of motion in her left shoulder and positive Neer, Hawkins, and empty can tests. *Id.* at 5.

Dr. Cleland concluded that Petitioner's shoulder pain "appear[ed] to be rotator cuff mediated" with "[n]o sign of large thickness complete tear." *Id.* at 6. However, Petitioner also described experiencing Lhermitte sign, which suggested a potential neurological issue.[7] *See id.* Dr. Cleland's differential diagnosis was C5-6 radiculopathy. *Id.* Dr. Cleland took an x-ray,[8] administered a left subacromial bursa steroid injection, recommended PT, and told Petitioner to see a neurologist. *Id.*

---

[6] Petitioner submitted an affidavit on January 5, 2024 stating that when she referred to an "October" vaccination in this and other records, she meant the September 13, 2018 vaccination. Ex. 34 at 1.

[7] Lhermitte sign is "the development of sudden, transient, electric-like shocks spreading down the body when the patient flexes the head forward; seen mainly in multiple sclerosis but also in compression and other disorders of the cervical cord." *Lhermitte sign*, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=106344 (last visited July 30, 2025).

[8] This x-ray was unremarkable except for "straightening of the cervical lordosis and slight retrolisthesis of C5 on C6. There is a posterior disc osteophyte complex at this level which effaces the subarachnoid space but does not frankly compress the spinal cord." Ex. 4 at 1.

On March 1, 2019, Petitioner had a PT appointment. Ex. 4 at 1. Petitioner complained of neck and left shoulder pain. *Id.* at 2. Petitioner stated that the left shoulder pain "began after a flu shot in October." *Id.* However, she added that her "PMR doctor," presumably Dr. Cleland, "told her that her pain most likely was not from her flu shot." *Id.* However, Petitioner also reported that her primary care doctor "told her that her symptoms are occurring because of her flu shot."[9] *Id.* Petitioner had limited left shoulder range of motion and hypomobility in the interior and anterior capsule of her left shoulder. *Id.* at 5.

Petitioner had a second PT session on March 15, 2019, and a third on March 22, 2019. *Id.* at 7-14. At both sessions, Petitioner reported that her pain was decreasing but still present with certain movements. *See id.* Petitioner demonstrated improved left shoulder flexion and abduction range of motion. *Id.* at 9, 13. Petitioner's treatment plan was six to eight sessions of PT, but it appears that Petitioner agreed to call and schedule additional visits only if needed after her third session. *See id.* at 13.

During this same time period, Petitioner's new PCP, Dr. Sandra Berglund, ordered testing of Petitioner's thyroid function and a thyroid ultrasound. *See* Ex. 3 at 20-21, 30. Petitioner was diagnosed with Hashimoto's thyroiditis and prescribed synthetic thyroid hormone.[10] Ex. 30 at 421-422.

On April 2, 2019, Petitioner had an appointment with neurologist Dr. Joseph Hanna. Ex. 5 at 1. It does not appear that Petitioner specifically complained of left shoulder pain, but instead discussed "right anterior thigh burning since 11/18." *Id.* Dr. Hanna also noted Petitioner's "[p]rior neck issues" and positive Lhermitte sign. *Id.* Dr. Hanna stated that there was a need to "assess for demyelination" based on the Lhermitte sign and ordered an MRI of the cervical spine. *Id.* at 4.

Petitioner underwent this MRI on April 23, 2019. Ex. 5 at 5. The MRI showed two focal areas of hyperintensities in the spinal cord that were "suspicious for demyelinating plaques in the appropriate clinical settings." *Id.* at 6. Further, these plaques were "new

---

[9] It is unclear when Petitioner received this information from her PCP. Petitioner does not assert that she had any medical care between the September 13, 2018 flu vaccine and her appointment with Dr. Cleland on February 5, 2019. *See* Pet'r Br. at 3. Petitioner had an appointment with primary care physician ("PCP") Dr. Sandra Berglund on March 1, 2019, but these notes are handwritten and nearly illegible. *See* Ex. 3 at 39.

[10] Hashimoto's thyroiditis is a "a progressive type of autoimmune thyroiditis with lymphocytic infiltration of the gland and circulating antithyroid antibodies" that causes hypothyroidism. *Hashimoto's thyroiditis*, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=70395 (last visited July 30, 2025).

from the prior study of 2014." *Id.* There were also "[m]ild degenerative changes in the cervical spine without any cord compression." *Id.*

Petitioner saw Dr. Hanna for a follow-up on May 21, 2019. *Id.* at 7. Petitioner's chief complaint was "tingling" in her lower extremities without reference to her shoulder. *Id.* Dr. Hanna's impression after reviewing the MRI was "myelopathy without clear cause Immune vs. autoimmune." *Id.* at 11. Dr. Hanna ordered a lumbar puncture to assess Petitioner's cerebral spinal fluid. *Id.* Petitioner returned to Dr. Hanna on August 1, 2019, after her lumbar puncture. *Id.* at 17. This lumbar puncture ruled out multiple sclerosis ("MS"). *See* Ex. 8 at 1. Dr. Hanna's impression was now "myelitis in setting of other autoimmune." Ex. 5 at 17.

On June 18, 2019, on request from Dr. Hanna, Petitioner had a consultation with Dr. Jorge Calles-Escandon, an endocrinologist. Ex. 7 at 1. Dr. Calles-Escandon noted that Petitioner had been referred for "evaluation and management of mild hypothyroidism present since last few months but also neurological syndrome which has been recently diagnosed as compatible with a transverse myelitis." *Id.* Petitioner reported various issues such as fatigue, insomnia, tachycardia, hair loss, and "an overall sensation of general decline." *Id.* In particular, Dr. Calles-Escandon discussed with Petitioner "recent evidence linking Hashimoto with transverse myelitis." *Id.* at 3. Petitioner followed up with Dr. Calles-Escandon on August 11, 2019, and reported feeling "pretty much the same" with a continuation of "neurological symptoms." *Id.* at 4.

On July 12, 2019, Petitioner received a genetics evaluation from Dr. Rocio Moran. Ex. 8 at 1. Petitioner reported that "[b]ack in November 2018 she noted a burning sensation in her leg." *Id.* Petitioner stated that her symptoms were intermittent and complained of balance issues, arm weakness, and leg pain. *Id.* Dr. Moran stated that Dr. Hanna had told Petitioner that her symptoms were due to her AIP. *Id.* Dr. Moran discussed management of AIP and ordered lab testing. *Id.*

Dr. Hanna also referred Petitioner to the Cleveland Clinic Neurologic Institute, where she was seen on August 9, 2019 by Neuroimmunology Fellow Dr. Samuel Cohn and Associate Staff Neurologist Dr. Kedar Mahajan. Ex. 3 at 14. Petitioner reported that "[s]he received a flu shot in September 2018 and developed left shoulder pain and difficulty raising her left arm a few days later."  Ex. 9 at 2. Petitioner "also noticed burning pain in the right leg, which seemed to worsen with neck flexion." *Id.* These doctors concluded that Petitioner had "[c]ord lesions suggestive of demyelination with low risk of MS with normal MRI brain and [cerebral spinal fluid]. Her burning pain may be related to these lesions or AIP causing peripheral neuropathy." Ex. 3 at 14. The "working diagnosis" was "transverse myelitis with low risk for MS." *Id.* at 15.

8

On September 19, 2019, Petitioner had a "therapeutic and general relaxation massage" with a licensed massage therapist ("LMT") at the Cleveland Clinic. Ex. 10 at 1. The LMT reported that Petitioner received the flu shot and "felt pain in her left deltoid and then limited movement in her left arm when raising it above her head. Then she started having weakness, pain as well as burning, electrical shooting pains down both legs." *Id.* The LMT also noted that Petitioner had been diagnosed with transverse myelitis. *Id.*

Petitioner returned to the Cleveland Clinic Neurologic Institute on October 18, 2019 and endorsed "worsening symptoms in her [left upper extremity] (sensory and motor) and bilateral lower extremities (sensory)." *Id.* at 11. Petitioner listed her current symptoms as including "burning-type pain in the legs, severe in the morning and evening," "left arm pinching pain worse with movement," "intermittent shock-like pains" in her hips, and "difficulty putting a backpack on with left arm." Ex. 9 at 4. Dr. Mahajan considered that the possibilities for these symptoms included "worsening from prior cord lesions versus a neuropathy. She has some degenerative changes in her cervical spine which could be symptomatic." Ex. 3 at 11.

On April 8, 2020, Petitioner had a telemedicine visit with another neurologist, Dr. Steven Benedict, on referral from Dr. Frantz. Ex. 11 at 31. Petitioner reported that she first experienced a "burning sensation in the thigh of her right leg" that "occurred after her receiving the flu shot." *Id.* Petitioner stated that "she continued to have symptoms in her legs over the next several months including some difficulties with her left arm." *Id.* Dr. Benedict reviewed Petitioner's history, ordered further MRIs, and would consider an EMG. *Id.* at 33.

Petitioner returned to Dr. Benedict on July 20, 2020. *Id.* at 2. Petitioner continued to report "some incoordination in her left upper extremity" and "burning type pain radiating down the lateral aspects of her legs which occurs intermittently and is more pronounced at night." *Id.* Dr. Benedict stated that Petitioner had "transverse myelitis manifest as demyelinating process in the cervical spine which occurred 4 weeks status post influenza injection." *Id.* at 4-5. Dr. Benedict prescribed amitriptyline (Elavil) and suggested that Petitioner participate in PT. *Id.* at 5. Petitioner had another follow-up with Dr. Benedict on November 9, 2020, where she reported similar symptoms. Ex. 12 at 11.

On September 10, 2021, Petitioner saw a colleague of Dr. Benedict, neurologist Dr. Adam Kapler.[11] Ex. 15 at 2. Petitioner reported that her arms were without symptoms,

---

[11] Prior to this appointment, on May 18, 2021, Dr. Kapler ordered an EMG. The "reason for referral" on the EMG report states that Petitioner had leg weakness on both sides that "started at 2018 after flu vaccine with difficulties of walking and burning sensation in both legs (hips and all the way down to feet[)]." Ex. 29

but that she had a vague sense of weakness in her legs that made her job more difficult. *Id.* Dr. Kapler stated that, "4 weeks after an influenza injection, she developed difficulty walking and some burning sensation in her right anterior leg," had Lhermitte sign, and "also had some trouble lifting her arm." *Id.* at 3. Dr. Kapler believed that Petitioner's 2019 MRI results "may have represented a postvaccine transverse myelitis" but that he did not currently see any signs of a demyelinating disease or ongoing process on her most recent imaging. *Id.* Dr. Kapler concluded that Petitioner's current symptoms were residual from transverse myelitis. *Id.*

Over a year later, on October 28, 2022, Petitioner had an appointment with a new neurologist, Dr. Christopher Hassett. Dr. Hassett performed a chart review and repeated Dr. Kapler's note that Petitioner's symptoms developed "4 weeks after an influenza injection." Ex. 22 at 3. Dr. Hassett's impression was that Petitioner had "suffered an episode of transverse myelitis" that "seemed mostly resolved" on the imaging. *Id.* at 3, 5, Given this resolution, Dr. Hassett had doubts that the diagnosis of transverse myelitis continued to explain Petitioner's ongoing symptoms. *Id.* at 3.

### C.   Petitioner's Workers' Compensation Claim For Transverse Myelitis

On May 4, 2020, Petitioner filed a workers' compensation claim for "[m]yelitis at T1-2, C5-6" based on her employer's mandatory vaccination program. Ex. 30 at 563. Petitioner stated that the date of her injury was May 9, 2019, the date that she asserted that she was diagnosed with transverse myelitis. *Id.* at 420, 563.

As in her previous workers' compensation claim, Petitioner was seen by multiple doctors as part of her claim process, separate from the care described above. On June 15, 2020, on referral from her workers' compensation attorney, Petitioner was examined by neurologist Dr. Howard Tucker. *Id.* at 444. Dr. Tucker wrote that, "[i]n 2018 she receive[d] a flu shot and after the shot left arm was painful and several days later became weak. At the same time she developed a burning pain in the right anterior thigh." *Id.* Dr. Tucker reviewed Petitioners treatment history and concluded that "[h]istorically this fits with a post vaccination problem." *Id.*

On July 13, 2020, Dr. Erickson performed an independent medical examination of Petitioner. *Id.* at 449-452. Petitioner described that she received the flu vaccine on September 13, 2018 and had "some weakness and pain in the left upper extremity," but did not specify when this started. *Id.* at 449. Petitioner stated that she did not seek any treatment for her symptoms and developed an electrical shock sensation and weakness

at 4. This EMG was normal. *Id.* at 6. Petitioner also had a normal head and cervical spine MRI at the same time. *See* Ex. 8 at 1-8.

in her lower extremities "[o]ver the next several months." *Id.* Dr. Erickson opined that Petitioner did in fact have transverse myelitis but appeared to give weight to Dr. Calles-Escandon's suggestion that this condition was "part of an autoimmune disorder in association with Hashimoto's thyroiditis." *Id.* at 451. Dr. Erickson therefore found that Petitioner's transverse myelitis was not related to her flu vaccination. *Id.*

On October 28, 2020, Dr. Tucker provided a letter to Petitioner's counsel opining that Petitioner's "spinal cord lesions and entire neurological presentation relates causally and proximately to the vaccination." *Id.* at 432. Dr. Tucker found that the close temporal relationship between onset and vaccination created a medically probable association. *See id.* Dr. Tucker reported Petitioner's onset slightly differently from his June 15, 2020 notes, stating that Petitioner received a flu shot in 2018 "in her left arm that left the arm painful. Several days later the pain persisted and the arm became weak. At the very same time she developed a burning pain in her right anterior thigh." *Id.*

After reviewing Dr. Tucker's October 28, 2020 narrative, Dr. Erickson wrote an addendum to his independent medical evaluation. *Id.* at 429-430. Dr. Erickson disagreed with Dr. Tucker's conclusion because it was inconsistent with Dr. Hanna's finding that the myelopathy was without a clear cause. *Id.* at 430. Dr. Erickson also noted that two events happening close in time did not establish a cause and effect relationship. *Id.*

On November 3, 2020, the Industrial Commission of Ohio held a telephonic hearing on Petitioner's claim. *Id.* at 420-428. Petitioner testified under oath. *Id.* at 420. At the hearing, for the first time, Petitioner specified that her difficulty raising and using her left arm and left arm weakness began the evening of September 13, 2018. *Id.* at 421. Then, "within a few weeks," she noticed a strain in her right thigh, and a numbness, tingling, and weakness in both legs. *Id.*

However, Petitioner did not endorse any orthopedic explanation for her condition. Petitioner explained that although her initial treatment was orthopedic, Dr. Cleland and the physical therapist felt that her injury was neurologic in nature. *Id.* Petitioner stated that the shoulder x-ray performed by Dr. Cleland was "negative for any type of orthopedic injury." *Id.* Petitioner also stated that she believed that her condition was a "post vaccine autoimmune phenomena." *Id.* at 426.

The Staff Hearing Officer issued a decision finding that Petitioner failed to establish by a preponderance of the evidence that she sustained an injury in the course of and arising out of her employment. *Id.* at 16. Specifically, the medical evidence was insufficient to establish that Petitioner's transverse myelitis was the direct and proximate

result of the vaccination. *Id.* at 417. The Staff Hearing Officer found Dr. Erickson's reports to be persuasive. *Id.*[12]

## D.    Affidavit Evidence

Petitioner's first affidavit was filed shortly after the Petition, on February 3, 2021. Ex. 13 at 1-3. This affidavit did not provide any information about the onset of Petitioner's symptoms. *See id.* Instead, it merely recited Petitioner's treatment history after the September 13, 2018 vaccination. *See id.*

After Respondent filed his July 20, 2023 Rule 4(c) Report, Petitioner filed a second affidavit. In this affidavit, Petitioner stated that she "instantly" felt "intense pain and swelling" after receiving the vaccine. Ex. 32 at 1. By the end of her shift, Petitioner "was feeling severe pain" in her left arm and started to have difficulty with her range of motion. *Id.* Petitioner explained that her shoulder symptoms "continued to worsen over the next days" and then, a couple weeks later, she developed pain in her back, trouble walking, and the burning sensation in her right thigh. *Id.* at 1-2. This burning sensation progressed to "intense unbearable pain" that affected her balance and ability to sleep. Petitioner also reported urinary symptoms and incontinence. *Id.* at 2.

In this second affidavit, Petitioner also explained that she did not immediately seek treatment because her mother was sick with cancer and her daughter was planning her wedding. *Id.* at 2. Petitioner stated that, as a nurse, she attempted to self-treat her shoulder with rest and ice and by using her right arm. *Id.* However, "[a]round the holidays," presumably late December 2018, her symptoms continued to worsen and Petitioner decided to "make arrangements to be seen by a doctor." *Id.* Petitioner made the next available appointment with Dr. Cleland, which was not until February 5, 2019.

In terms of her other medical issues, Petitioner asserted that she "previously experienced a muscle strain in her neck in 2014" but that she "never received a formal diagnosis" for this issue. *Id.* Petitioner stated that this "muscle strain" completely resolved after PT and a steroid injection. *Id.* Petitioner then characterized her Hashimoto's thyroiditis as an "incidental finding." *Id.* Petitioner denied experiencing any symptoms from her AIP or degenerative disk disease. *Id.*

Petitioner also submitted an affidavit from her husband, David Sirl. Mr. Sirl stated that he had "independent recollection" of Petitioner returning home after her nursing shift

---

[12] Petitioner appealed this decision to the Court of Common Pleas of Cuyahoga County, Ohio on February 4, 2021. *See* Ex. 30 at 405. However, it appears that Petitioner voluntarily dismissed this case, without prejudice, on August 25, 2022. *Id.* at 398.

on September 13, 2018 "complaining of severe pain localized to her left deltoid area." Ex. 33 at 1. Mr. Sirl recalled that Petitioner's shoulder pain "progressed over the next few weeks and she developed pain and weakness in her thighs and lower back." *Id.* Additionally, Mr. Sirl reiterated that Petitioner eventually decided that she needed to see a doctor, but the first appointment "was months out."[13] *Id.* at 2.

### III.    Petitioner's Table SIRVA Claim is Not Tenable

#### A.    Legal Standards for Table Claim

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A petitioner may prevail on his claim if he has "sustained, or endured the significant aggravation of any illness, disability, injury, or condition" set forth in the Table. Section 11(c)(1)(C)(i). If a petitioner establishes a Table injury, causation is presumed. If, however, the petitioner suffered an injury that either is not listed in the Table or did not occur within the prescribed time frame, the petitioner must prove that the administered vaccine caused his injury. Section 11(c)(1)(C)(ii) and (iii); *see Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1279-80 (Fed. Cir. 2005).

*Althen* requires that a petitioner

> to show by preponderant evidence that the vaccination brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Id.* All three prongs of *Althen* must be satisfied. *Id.*

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally

---

[13] Mr. Sirl also characterized Petitioner's 2014 medical issues as a "short-lived work injury that resulted in neck strain." Ex. 33 at 2. According to Mr. Sirl, this neck strain was completely resolved by 2018. *Id.*

contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Id.* at *19. And the Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993). The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). A SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction

studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B.    First QAI – No History of Pain or Dysfunction In the Affected Shoulder That Would Explain Petitioner's Post-Vaccine Symptoms

In opposing compensation, Respondent argues that Petitioner had a history of left shoulder pain and a previous diagnosis of degenerative changes in her cervical spine that would explain her symptoms and thus she cannot meet the first QAI. Rule 4(c) Report at 7; Resp't Br. at 6-7. In response, Petitioner attempts to minimize her April 2014 injury as a mere "short-lived" muscle strain in her neck. *See* Pet'r Br. at 17-18; Ex. 32 at 2; Ex. 33 at 2. Further, given Respondent's emphasis on the specific diagnosis of degenerative disk disease, Petitioner contends that she never received any treatment for this condition and has never experienced any symptoms related to this diagnosis. Pet'r Br. at 18; Ex. 32 at 2.

Petitioner ignores the striking similarities between the symptoms that she reported in 2014-15 and after her vaccination. In particular, after the April 9, 2014 incident, Petitioner repeatedly and consistently reported neck pain that radiated down her left side into her shoulder and to her elbow. *See* Ex. 30 at 28, 45-46, 48-50, 126, 130, 153, 171, 205, 261. Petitioner also reported left arm weakness and pain when lying on her side or driving. *See id.* at 50, 153. Further, as in this case, Petitioner and her treaters considered potential neurologic explanations for her symptoms. *See id.* at 28, 126, 155. I agree with

15

Respondent that Petitioner's contemporaneous complaints to her treaters, and to the doctors performing workers' compensation claim examinations, do not match her current characterization of this injury as a simple muscle strain.

However, after reviewing the entire record, I conclude that Petitioner has established this QAI in her favor by a preponderance of the evidence. Significantly, Petitioner ceased treatment of her workplace injury by Fall 2015 and did not pursue the additional investigations suggested by Dr. Hochman. *See id.* at 28. Petitioner did not mention any continuation of her previous symptoms at her May 2, 2018 routine physical and seemed to be in good health.[14] *See* Ex. 26 at 8. The medical records fully support Petitioner's affidavit testimony that her neck injury had resolved by the time of vaccination in September 2018. Accordingly, on this QAI at least, there is preponderant evidence that Petitioner's previous issues would not explain her post-vaccination symptoms.

### C.     Second QAI – Onset Within 48 Hours

A Table SIRVA claim requires proof of onset of shoulder pain within 48 hours of vaccination. 42 C.F.R. §§ 100.3(a)(XIV)(B), (c)(10)(ii). Respondent focuses on Petitioner's five-month delay in seeking treatment after vaccination. Rule 4(c) Report at 7; Resp't Br. at 5-6.[15] To counter this argument, Petitioner relies on her (and her husband's) November 2023 affidavit statements that her pain began immediately after vaccination but that she attempted to self-treat her injury, was dealing with difficult personal circumstances, and could not get an appointment until February 2019. Pet'r Br. at 15; Pet'r Reply at 2; Ex. 32-33.

As Petitioner notes, it is common for a SIRVA petitioner to think that the injury will resolve on its own and delay seeking treatment. Pet'r Br. at 15 (citing *Werning v. Sec'y of Health & Hum. Servs.*, 18-0267V, 2020 WL 5051154, at *9 (Fed. Cl. Spec. Mstr. July 27, 2020)). In numerous other cases, despite delays in seeking medical care, when the evidence does not support a specific alternative onset, I have found preponderant evidence to support an onset within 48 hours. However, in the instant case Petitioner's affidavit evidence cannot overcome the overwhelming number of medical records in

---

[14] Respondent also notes that Petitioner initially assumed that her symptoms were being caused by her "3 year history" of neck pain when she saw Dr. Cleland on February 5, 2019. Rule 4(c) Report at 7; Resp't Br. at 6; Ex 2 at 1. However, I do not read Dr. Cleland's description of Petitioner's complaint as that she had left neck and shoulder pain continuously for the past three years.

[15] In his brief, Respondent also argues that Petitioner repeatedly reported that her pain began in October 2018, which would be several weeks after the September 13, 2018 vaccination. Resp't Br. at 5-6. However, this appears to be a misreading of Petitioner's statements to her treaters that she *received* the flu vaccine in October 2018. Petitioner provided an affidavit explaining that she made a mistake identifying the month that she received the vaccine when explaining her medical history. *See* Ex. 34. This error, by itself, does not weigh against a 48-hour onset.

which she reported a later onset of her symptoms, much of which was not even shoulder-related.

For example, Petitioner informed Dr. Hanna, without mentioning her left shoulder, that she had a sensation of burning in her right thigh "since 11/18." Ex. 5 at 1. Similarly, Petitioner told the geneticist, Dr. Moran, that "[b]ack in November 2018 she noted a burning sensation in her leg" and did not separately describe any shoulder pain. Ex. 8 at 1. To Dr. Benedict, Petitioner stated that she first experienced a burning sensation in her right thigh that developed "over the next several months, including some difficulties with her left arm" and that her symptoms manifested "4 weeks status post influenza injection." Ex. 11 at 4, 31. Petitioner repeated to Dr. Kapler that her symptoms started with difficulty walking and "trouble lifting her arm" that occurred "4 weeks after the influenza injection." Ex. 15 at 3. Dr. Hassett also included this report of an onset four weeks after vaccination in his notes. Ex. 22 at 3. At best, and still not sufficient, Petitioner reported to Dr. Mahajan that she received the flu vaccine in September 2018 and "developed left shoulder pain and difficulty raising her left arm a few days later." Ex. 9 at 2.

Petitioner points to records in which she told her treaters more generically that she experienced left shoulder pain that began "after" receiving the flu vaccine. *See* Pet'r Br. at 3, 16 (citing Ex. 2 at 1, Ex. 4 at 2, 5; Ex. 10 at 1). Petitioner also highlights that she initially reported to Dr. Cleland that the flu vaccine "started some left arm pain." *See* Pet'r Br. at 3 (citing Ex. 2 at 1). To sustain a SIRVA claim, the Vaccine Program does not require that a petitioner use absolute precision in reporting when her pain began. Characterizations of onset using terms like "since," "shortly after," and "following" the vaccination are typically understood to "mean *very* close in time – immediately, or at most within a day or two" after vaccination. *Flowers v. Sec'y of Health & Hum. Servs.*, No. 20-285V, 2024 WL 2828211, at *11 (Fed. Cl. Spec. Mstr. May 8, 2024), *mot. for rev. den'd*, 173 Fed. Cl. 613 (2024).

Nevertheless, in light of the numerous records that clarify what Petitioner meant by "after," I cannot conclude that any left shoulder pain had its onset within 48 hours of vaccination. I give greater weight to Petitioner's statements to her treaters for the purpose of obtaining medical care than to her later effort during this litigation to cast her injury as more SIRVA-like with an immediate onset.[16]

---

[16] Similarly, I also give less weight to Petitioner's testimony in the November 3, 2020 workers' compensation hearing that her difficulty raising and using her left arm and left arm weakness began the evening of September 13, 2018. Ex. 30 at 421. Although this statement was under oath, it is contradicted by her earlier medical records. Petitioner also based her workers' compensation claim on a May 19, 2019 diagnosis of transverse myelitis, further suggesting that she did not view her injury as beginning one to two days after vaccination. *See* Ex. 30 at 420.

### D.    Fourth QAI – Other Condition or Abnormality

Even if I were to accept Petitioner's arguments regarding onset, Petitioner's claim would still fail on the fourth QAI. This QAI asks whether there is a condition or abnormality present that would explain Petitioner's symptoms. *See* 42 C.F.R. § 100.3(c)(10)(iv). This reflects an *affirmative* burden borne by petitioners because they must meet all QAIs to obtain the benefits of a Table claim, where causation is presumed. As a result (and unlike in the context of a causation-in-fact claim), a SIRVA petitioner cannot evade this kind of evidence as easily as can be done in the non-Table context.[17] Petitioner is therefore incorrect that it is Respondent's burden to explain medically how any other condition caused her left shoulder pain. *See* Pet'r Br. at 17-19.

In resolving this QAI against Petitioner, I give significant weight to the fact that Petitioner and her treaters consistently considered her left shoulder pain as part of a constellation of neurological symptoms and not an injury to the "musculoskeletal structures of the shoulder," as is required for a true SIRVA. *See* 42 C.F.R. § 100.3(c)(10). The medical records demonstrate that Petitioner was diagnosed with transverse myelitis, although there was debate among the various specialists, and the doctors performing workers' compensation claim examinations, as to its cause. Petitioner has not sufficiently disentangled her shoulder complaints from alternative explanations for them. *See Achanzar v. Sec'y of Health & Hum. Servs.*, No. 21-2044V, 2024 WL 5298067, at *9 (Fed. Cl. Spec. Mstr. Nov. 25, 2024). Here, as in another case addressing the interplay of SIRVA and a neurological condition, "[t]he tenor of Petitioner's symptoms is simply inconsistent with the persistent, shoulder-specific pain common to a SIRVA. Rather, the evidence preponderates in favor of the finding that Petitioner's symptoms were broader and more neurologic in character." *Wessinger v. Sec'y of Health & Hum. Servs.*, No. 21-518V, 2023 WL 8234551, at *8 (Fed. Cl. Spec. Mstr. Oct. 23, 2023).

Further, there is no evidence supporting the conclusion that Petitioner experienced a SIRVA distinguishable from a separate neurological injury. *See id.*; *cf. Nargi v. Sec'y of Health & Hum. Servs.*, No. 19-1859V, 2024 WL 4814752, at *9 (Fed. Cl. Oct. 11, 2024) (explaining that the petitioner "exclusively demonstrated symptoms expected in a potential SIRVA for almost three years before exhibiting any symptoms of a neurologic nature."). Petitioner notes that she received a diagnosis of "disorder of rotator cuff

---

[17] *See, e.g., Durham v. Sec'y of Health & Hum. Servs.*, No. 17-1899V, 2023 WL 3196229 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) at *14; *Rance v. Sec'y of Health & Hum. Servs.*, No. 18-0222V, 2023 WL 6532401, at *29 (Fed. Cl. Spec. Mstr. Sept. 11, 2023); *French v. Sec'y of Health & Hum. Servs.*, No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023) ("[T]his Table element does not impose on Respondent the obligation to prove an alternative cause, but instead merely that the record contains sufficient evidence of a competing explanation to 'muddy' a finding that vaccine administration was the cause.").

syndrome of the left shoulder" from Dr. Cleland.[18] Pet'r Br. at 18 (citing Ex. 2 at 6). But even at this initial appointment, Petitioner described her left shoulder pain as radiating from her neck and associated it with thigh pain and numbness.[19] *See* Ex. 2 at 1. Petitioner also acknowledged under oath that Dr. Cleland and the physical therapist believed that her issues were neurological. *See* Ex. 30 at 421; Ex. 4 at 1. As discussed below, it remains the case that "[c]laims involving shoulder pathology in the presence of significant and potentially confounding neurologic signs and symptoms are better addressed on a causation-in-fact basis." *Durham v. Sec'y of Health & Hum. Servs.*, No. 17-1899V, 2023 WL 3196229, at *14 (Fed. Cl. Spec. Mstr. May 2, 2023). I therefore dismiss the Table SIRVA claim.

## Conclusion

Petitioner is not entitled to damages under her Table SIRVA claim and therefore that claim is dismissed.

IT IS SO ORDERED.

s/Daniel T. Horner
Daniel T. Horner
Special Master

---

[18] A diagnosis of a rotator cuff tear is "not incompatible with SIRVA or with the suspected mechanism by which SIRVA manifests." *See Grossmann v. Sec'y of Health & Hum. Servs.*, No. 18-00013V, 2022 WL 779666, at *17 (Fed. Cl. Spec. Mstr. Feb. 15, 2022); *see also Lang v. Sec'y of Health & Hum. Servs.*, No. 17-995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) ("Accordingly, findings consistent with impingement, rotator cuff tears, or AC arthritis do not *per se* preclude a finding that a Table SIRVA exists. Rather, the question raised by respondent's argument is whether petitioner's own clinical history indicates that her shoulder pathology wholly explains her symptoms independent of vaccination."). However, I do not find this initial diagnosis supportive of Petitioner's claim given Petitioner's treaters' subsequent and lengthy focus on her neurological symptoms.

[19] Respondent did not raise the third QAI, that pain and reduced range of motion must be limited to the shoulder in which the vaccine was administered, in his Rule 4(c) Report. However, in his brief, Respondent argues that Petitioner cannot meet this requirement because at her February 2, 2019 appointment, she described her pain as radiating from her neck and had full range of motion in both shoulders. Resp't Br. at 7. Respondent's objection is better placed as part of the fourth QAI because Petitioner reported pain, weakness, and limitations in movement in her left shoulder as part of broader neurological symptoms, including burning pain in her legs and trouble walking. *See, e.g.*, Ex. 11 at 31-32.